Good morning, Your Honors. Good morning. For the record, my name is Ross Dave. I represent the plaintiff appellants in this matter, Barbara Preti, Gene Preti, and Jason Williams. I'd like to reserve three minutes or somewhere thereabout, some approximation of three minutes, I suppose. The clock's on the wall, so you're going to be going from ten up to about five after, and that'll give you, is that right? That sounds about right, Your Honor. Yeah, a little, yeah. Ballot Measure 26 was overwhelmingly approved by the voters of Oregon in November of 2002. The measure purports to prohibit payment by the signature to persons circulating only initiative and referendum petitions. Measure 26 does not apply to recall or candidate nominating petitions. Barbara and Eugene Preti and Jason Williams Those provisions are in a separate constitutional section. Separate part of the Constitution, that's correct. But Measure 26, if I'm out circulating a petition, and I say I want to repeal the Multnomah County Business Income Tax, that is subject to Measure 26. But if I'm circulating a petition saying I want to recall the county chairwoman, it's virtually the exact same piece of paper. I've still got to go out and get signatures. Measure 26 does not apply. The only distinction between the two is the content of my message. Am I advocating for the support of a, excuse me, advocating for the support of a repeal of an income tax measure, or am I advocating for the recall of a candidate? Are there different procedures, different forms, that have to be filled out for one or the other? There is a, both of them require a certain number of signatures in order to either qualify the measure for the ballot or qualify the question for the ballot. Either one. Do the petitions, when they're presented to the voters, look identical through all practical purposes? Yes, Your Honor, and I think it exhibits one and two in my brief, in the opening brief. I've got copies of the actual petitions, and they look virtually identical. And when Measure 26 went through, does Oregon have the, as California does, the single subject law? That is, you can't put two different topics in the same initiative? We do. That particular section of the Constitution, the single subject, it's actually in the legislative Article 4. It applies to legislative measures as well as initiated and referred measures. That is fairly liberal as compared to California. The hook, if you will, in Oregon is what we call the Armada Test. It's under Article 17, Section 1 of our Constitution. It says that two amendments to the Constitution, no two amendments to the Constitution that are not closely related can be submitted in the same question. And was that ever argued or raised in Measure 26 as to whether they could go beyond initiatives and referendums and get over into nominating and recall? Not in this case. Now, the intervener at the time of Measure 26 never raised it. I don't believe it was, Your Honor. I don't believe. During the public debates, if you will, however limited they were, there was no organized opposition to Measure 26 that I'm aware of. In fact, I believe there's only two voters' pamphlet statements, which in Oregon voters' pamphlet statements are legislative history. I think there was only a couple of opponents. I don't believe those issues were ever raised. The interveners state in their brief that they could not have affected recall or nominating petitions because then it would violate Oregon's Armada Rule. But nevertheless, the measure still regulates based on the content of the petition that you're circulating. Measure 26 only applies if I'm advocating on behalf of recalling a – excuse me, only if I'm advocating for the adoption of a measure. And the Supreme Court has said that the First Amendment's hostility to content-based regulation extends not only to restriction to a certain viewpoint. Both the state and the interveners argue that Measure 26 doesn't apply – only applies to viewpoints. But this isn't a – Excuse me. It's not really a viewpoint. It's serving different functions. One is to recall or nominate, and the other is to pass an initiative or a referendum. And the Supreme Court has said that it not only extends to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic. Well, there's no prohibition of discussion. That's correct. It's not a specific prohibition, but it is a restriction, which the evidence demonstrates burdens our – burdens my client's ability to go out and circulate petitions. So what you're saying then – what you're saying then is for all practical purposes, any reform dealing with voter participation, you must always, under Oregon structure, you must always deal with both initiative and referenda and recall and nominating petitions as if they're all part of the same grouping. Not necessarily, Your Honor. I think only to the extent that it implicates the core one-on-one communication, the communicative aspects of the process, I think, and certainly – How does that add anything to your argument, then, that initiative and referenda affect, without regard to whether it also applies to recall and nominating? That's your other argument, I thought, which is simply that if it affects the core one-on-one communication, then it comes under Myers and Buckley. So what does it add to bring in an equal protection or whatever other argument you're trying to make there? Because you seem to be saying it's viewpoint discrimination. In a manner – in a certain – I guess a manner way of looking at it, it is viewpoint. It's a broader viewpoint than opposed to should I vote for this tax or not. It's should I put a measure on the ballot or should I recall this person? The fact of the matter is under either one of the – if either one of those petitions, whether Measure 26 applies depends solely upon the content of my message. That's it. That's the only determining factor between whether Measure 26 would apply to a recall or a nominating petition versus an initiative or referendum petition. Now, there is a – there is a dispute on the motion to intervene, which I wasn't planning on getting into those arguments unless the court would like to hear – have some questions on those. We've also appealed that – the district court's decision in that matter. Ultimately, what difference does it make whether the court erred or not? There's still a viable party in the state, correct? That's correct, Your Honor. I suppose the concern that this court should have with the district court's order on the motion to intervene is the only alleged interest that the interveners made was that they were supporters of the measure, if you will. One of them is a chief petitioner and the other one is a supporter. The Supreme Court's case, which I cited in my brief, they've never said that a supporter or a chief petitioner is enough to sustain Article III standing, insufficient to sustain intervention. They argued a little bit more than that. They argued that because not only were they the supporters, they had particular expertise in the process that they brought to bear, knowledge about the issues relating to Measure 26. And that they weren't – it wasn't clear that they would be adequately represented by the state in that regard. Well, with regard to the adequacy of representation, the case law says that where their aim is the same as the state, then there's a presumption of adequacy. But the district court found that there wasn't. It overcame the presumption and found in favor of the separate interveners. No, I don't believe that they found in favor of the separate – excuse me, I don't believe they said that the interests were – No, no, I'm saying the district court did. You say there's a presumption, but that doesn't mean there's a blanket prohibition. That's correct. But the court did not – the court said that the – the court's findings were actually that they had different interests in the outcome of the litigation, not that they had the same interests, and therefore – and then the court didn't go into the adequacy of the representation issue. And one final question on this, and then you can move on to the substantive issue. But these are questions that have bothered me or I raised in my own mind, which is does one judge the adequacy of representation and the intervention factors as of the time intervention is granted, or does one look back in hindsight over the course of the litigation to decide whether, in fact, the state did adequately represent? I think, Your Honor, at the – I think it's the snapshot at that moment in time. And to finish – That is at the outset. Yes. That's correct, Your Honor. And just to finish up on that point, the policy issue, I think, with regard to this intervention question, is should the court sustain the district court's decision? What's to stop somebody like the organization that I work for from coming in and alleging the same basis for intervention? This court has held that that's not enough, and so has the Supreme Court. And I'd suggest to you that the district court's decision on that matter is in error. There's also another, I guess, procedural issue that we need to get past, and that is what's the standard of review? The state and the interveners allege that it's a clearly erroneous standard. This court's case in Cecilia Packing makes it fairly clear that when a district court upholds a restriction on speech, this panel conducts an independent de novo examination of the facts. The district court held below that, obviously, Measure 26, as it relates to the First Amendment, did not violate my client's First Amendment rights. Accordingly, the proper standard of review under Cecilia Packing is de novo of the case. With these principles in mind, I'll focus the remainder of my argument on Measure 26 and the burden, at times an overwhelming burden, that Measure 26 has placed on my clients. The test the Supreme Court applies in a case like this involving core political speech comes from Meyer v. Grant, where the court said any burden of core political speech must be narrowly tailored to achieve a governmental interest. District court in a fit of independence held that Measure 26 did not implicate core political speech. This finding is in error. In Buckley, the Supreme Court provides the side boards for determining whether a regulation implicates core political speech. Are you relying strictly on the fact that this is a petition process and, therefore, the statements in Meyer and Buckley mean that anything having to do with petition, regulating petition and referenda is, as a matter of law, has been determined for all cases to be core political speech? Absolutely not, Your Honor. I don't believe that that's what Meyer or Buckley stand for. I think what they ask the court to do is to examine what the regulation is and what aspects of the initiative process does the regulation regulate. In Meyer, the court said that to the extent basically we had a regulation of an economic relationship between the parties, such that it created a deterrence for professional circulators to come to the state of Colorado and apply their trade. Therefore, it diminished the ability. It wasn't. I mean, you're characterizing it as economic. That may have been the motivation of those who were some in part. But as I read Meyer's, the concern was it was reducing the number of messengers who would carry the message. That's what the one-on-one discussion is all about. So whether it's economic or not, that may be the fact because they were precluding any paid circulators. This doesn't preclude paid circulators. You're right. It doesn't, Your Honor. It goes to the manner in which they get paid. That's correct. It goes to the manner in which they get paid. And I think that the court in Meyer examines the facts and said, look, because this regulates an economic relationship between the parties, that the record shows deters individuals from coming to Colorado and applying their trade, that by diminishing the circulators available, it necessarily burdens speech. The critical error the district court made in this case is that the court says, well, we didn't produce one single professional circulator who testified that but for Measure 36, they would come to Oregon and apply their trade. That is, whether you use a clearly erroneous standard or a de novo standard, is just absolutely incorrect. I mean, I can't stress that point enough. The affidavit of Laura Cordes, she says, and I quote, because of Measure 26, I will not come to Oregon to circulate petitions slash signature gatherers, period. Now, the state and the intervener say, well, that's just pure speculation. I don't understand how. I think if anybody would be an expert on whether or not she'd come to Oregon and why, I think it would be Ms. Cordes. Maybe I'm wrong, but I'm just suspecting that she would probably know whether or not she'd come to Oregon and why. And she says very clearly in her affidavit, because of Measure 26, I'm not coming to Oregon to circulate petitions. There's other evidence as well. The testimony of intervener's expert, Jeanne Berg, who says that this is in the record at 98. She says that top circulators from 2002 had not yet returned to Oregon to apply their trade. The declaration of Angela Paparella, the affidavit of Thomas Bader, the declaration of David Rubin, the affidavit of Tracy Taylor, who testifies that Measure 26 has made it difficult for him to get professional circulators to Oregon. This is all evidence that the court either ignored or dismissed as speculation. These are all folks who know, especially the affiants, why they did or why they are not coming to Oregon. And they all testified it's for Measure 26. It's because of Measure 26. How the court could come out with a conclusion otherwise is absolutely beyond me. The evidence in the record absolutely demonstrates that there is a burden, as the court in both Meyer and Buckley said, that there is a burden that must be shown, that the challenged law is diminishing the number of voices available to go out and circulate the measure. And the evidence in this record could not be more clear how how we've come to a different conclusion. I'm not I don't understand it now. Wasn't there evidence presented by the police directly contrary that they didn't have any difficulty getting petition gatherers when they paid them by the hour? And you could certainly demand quotas. Couldn't you have work quotas? Your Honor, the question of whether or not we can have work quotas, I think, is still a question that hasn't been answered under the measure. There are some dealt with in the regulations. Well, there are some complaints that have been filed in particular with regard to petition referendum petition for one that that that imposing quotas was in violation of Measure 26. So and those as far as I'm aware, those complaints are still outstanding. But but the fact of the matter is what the what the record does show is that while they may have been able to to hire other inexperienced professional circulator, excuse me, other inexperienced circulators. The result is a one fifth reduction. Excuse me, the one fifth of the production they would ordinarily expect out of professional circulators. The evidence in the record says from Mr. Arno, who I mentioned parenthetically, is passed away earlier this year. Testifies that he's getting about a thousand signatures. I can't remember that a normal signature gatherer get about a thousand signatures. Five thousand signatures. And now he's only experiencing a rate of about a thousand signatures. But regardless of what what the experience of the interveners or the state or whomever might have been, the fact of the matter is, is that the evidence in the record demonstrates that there are that there are circulator professional circulators who are unwilling to come to Oregon to apply their trade. And that is causing a burden. So what you want us to do is to interpret Buckley and Meyer as requiring a de novo review of the facts by this court. And then you want us to take your evidence and the police evidence and find that de novo. Your Honor, that is that is what I'm arguing. That's what the discourse decisions in Sicilia packing. That's that's exactly what they they call for, especially in a case. Regardless of whether whether you applied de novo or clearly erroneous standard under under either standard, we we carry the day. Because, again, the court says we didn't produce one single professional circulator who said they wouldn't come to Oregon. But for measure 26. Well, can't we just put this one side with the court said under your de novo review? That's correct. Because that would be applicable in the clear error. No review. Whether the court said one thing or the other, we just put that to one side and just take a look at the record brand new. Trying to case ourselves based on this record and come to the conclusion that you wish to conclude. That's correct. And and the having demonstrated a burden, whether it be a your ordinary burden or a severe burden. I don't I don't know that that that that degree of difficulty, if you will, is even I think we can clear either bar. The evidence in the record demonstrates that the that measure 26 has had it had a marked increase in the cost of circulating petitions in the state of Oregon. It's also and probably what should be most troubling to the court. The evidence in the record also demonstrates that at least two chief petitioners, Jason Williams and Russell Walker, have said that because of Measure 26, because they because of their experience with initiative petitions, Measure 26 has made it too costly for them to go out and circulate more than one petition. And I think that in and of itself should be especially troubling to this court. It's forcing people, forcing chief petitioners to choose between between between measures. As you read the two cases, Buckley and Meyer, is any one of the three points that they make in those two cases? Number one, produce fewer petition gatherers to produce fewer valid signatures or generate more fraudulent signatures. If the regulation does any of those, is that sufficient to find it invalid? Or must all three be found? I think any one of the three. Your Honor, your time is about elapsed. So you may want to save some time for a moment. OK, I have one more point and then I'll sit down. And that is that Measure 26 has not been demonstrated to to eliminate fraud in the process. Jeanne Berg, again, the intervener's expert, testifies that in 2002 they made 15 complaints of fraud or forgery. For all practical purposes, Measure 26 went into effect September 8th, 2003. That's when the first petition that could be circulated under the measure went out on the streets. December 8th, 2003, Jeanne Berg testifies that she made one complaint. There's also evidence in the record that that Bill Arno may has made three complaints. That's four complaints in three months of fraud or forgery in 2004 under Measure 26. And if my math tells me, if my math skills are right, and I went to law school because I can't do math, but that's proportionately the same number of complaints in this record, on this record, as was in 2002 prior to Measure 26. They cannot demonstrate based on the facts in this record. They have a lot of speculation, a lot of people who think, well, I think that per signature payment, if you read their affidavits. Thank you for getting your point. All right. Thank you, Your Honor. May it please the Court. My name is David Leath, and I'm representing the Oregon Secretary of State, Bill Bradbury, today. Are you going to talk about your allocating time? I was going to do that. Thank you. Of the allotted 20 minutes, I intend to use approximately 15 and to save approximately five minutes for my colleague, Margaret Olney, who's representing the intervener, Apolise. Okay. Well, the big hand's on five. That's when I stop. Try. And if she's throwing things at me, I'll try to notice that as well. I would intend to defer for Ms. Olney the issue of intervention and to focus my time on the merits. I'll just mention that I certainly. We understand. We got your briefs on the intervention, so why don't you get to the hard line. Thank you. The record in this case shines a spotlight on the insidious corruption that has taken hold of Oregon's initiative and referendum signature-gathering process. It's undisputed that Measure 26 was designed and intended to eradicate. It might be useful if we sort of address some of the core issues. Why don't we go to content, first of all, so we know what regime we're in. And what's your response to the distinction they're making between the fact that it's regulating one aspect of voter communication but not the other, and therefore it's content discrimination? Well, we think that that argument essentially misunderstands the whole concept of what's a content-based regulation. This regulation applies universally to every message within its ambit. It doesn't regulate, restrict, limit, require anything of a particular message that anyone wants to convey. You say within its ambit, but the hypothetical pose was you could have a recall petition and a referendum, like an initiative petition, going out at the identical time. So you could have two petition circulators on a street corner. One could be paid on a per-signature basis, and the other paid only on an hourly. How do you justify that? I don't think that's content-based. I think that refers to the mode of the speech. Now, I think, I can't remember if it was Judge Fischer or Judge Bay, mentioned that the requirement, well, to begin with, these are creatures of Oregon law. The initiative and referendum petitions are creatures of one provision of the Oregon Constitution, recall and candidate-nominating petitions and special district petitions, and I don't know how many other types of petitions are other creatures of Oregon law. What kind of petition it is is not part of the message. The message is what's contained in the petition. What kind of petition it is, it's just a vehicle. It's a lawmaking vehicle. And you don't need, Oregon doesn't need to regulate each of its lawmaking vehicles under an identical rubric in order to satisfy the federal constitution. And I think that the... You don't read in the Equal Protection Clause in the First Amendment as applied to the states? Well, I don't think that there's any equal protection claims here, but I do think that there's an equal protection-like doctrine within First Amendment free expression doctrine that does require that you not discriminate against one message in favor of another message. It's discriminating based on the content of the speech. I would just say, though, in that respect, that that's not what we're doing. Whether the message is contained in one lawmaking vehicle under Oregon law or in another, that's not part of the message. You don't need to look at the message to find out whether this law applies. You just look at which lawmaking vehicle is being used to convey the message, and that's not discriminating on the basis of content. That's simply Oregon applying different procedures to different lawmaking processes, which I think is not prohibited by the federal constitution. And I think that the Supreme Court provides some useful guidance on that point in its McConnell v. FEC decision regarding the Campaign Finance Act of 2002. In McConnell, the Court says that the – in McConnell, the Supreme Court explained addressing an analogous contention, that reform can take one step at a time addressing itself to the phase of the problem which seems most acute to the legislative mind. That's 540 U.S. at 207 to 208. Essentially that the state in this case, the Congress in that case, can identify where its attention needs to be drawn and addressed and deal with problems as they are perceived to be more acute. So far from evidencing invidiousness, the limited scope holding just to the initiative and referendum process, I think demonstrates the narrow tailoring of this regulation. Are there concerns of fraud in the referendum, excuse me, the recall and the nominating petitions? Well, I'm not going to say that there's no evidence. The evidence that I'm aware of arose after Measure 26 was adopted and it had to do with the 2004 presidential election. Where at the time Measure 26 was adopted. I'm not aware that there was a perceived problem with respect to nominating petitions at that time. So I would say in conclusion on that point, that Oregon need not regulate all petitions in order to lawfully regulate these particular lawmaking vehicles provided under the Oregon Constitution. The standard of review, I think that opposing counsel is correct, that the standard of review is a critical point of departure between the two sides. And essentially what the plaintiffs would ask the court to do is to hold that despite Federal Rule of Civil Procedure 52, this court reviews every finding of fact made by the district court de novo because their claims arise under the First Amendment. And I don't think that that's a fair reading of this court's Planned Parenthood case. I think that the correct reading of that case and the cases or at least the case that follows that is that the historical facts found by the district court are binding under Rule 52 as long as they're not clearly erroneous. The constitutional facts are the ones that are reviewed de novo. In this case, zeroing in on all the evidence that counsel arrayed on burden, which is the constitutional issue that we're confronted with, whether there's severe burden, is that a historical fact or a constitutional fact? On that fact, and that's an excellent way to focus the point, the district court's findings that particular evidence was not credible are findings of historical fact that are entitled to deference under Rule 52. The court's conclusion or finding, if you prefer, that the found facts, the found historical facts, do not constitute a severe burden, that's for this court to review de novo, whether the believed evidence establishes a severe burden. Actually, I came across another case this weekend applying Planned Parenthood. It was a Ninth Circuit decision from 2002. I'd be happy to submit that after argument or I can provide a citation now. Is that delineation between historical and constitutional facts where its credibility is historical based on the found facts is constitutional, is that a decision, a distinction that's made in either Meyer or Buckley? I mean, I hate to say this, but maybe we were out of step in Planned Parenthood. And Judge Beyer wants to overrule our own bank. I don't recall that those cases turned on disputes of fact. I didn't see the words historical and constitutional linked with the word fact in either of those two cases. No. And I don't think that that arises from Buckley or Meyer. I think that that's circuit law that we're looking to for the standard of review. If I may provide a 2002 Ninth Circuit citation that supports our construction of the... Just give us the name of the case, and then you can provide it to counsel, copy, whatever. It's United States v. Hanna, Your Honor. Hanna? Hanna, H-A-N-N-A, and it's 393 Fed 3rd, 1088. It has the discussion of the standard of review. Okay, so moving on then, assuming that we've resolved the standard of review, is it your position that all of the affidavits and evidence regarding the burden that we must defer to the district court in its finding that those don't add up to severe burden because the court didn't accept them as credible, or they weren't persuasive, or that in total it concluded that they just didn't measure up to enough of a severe burden because they were out-of-state petitioners and there was speculation and the like? Help us sort through how you apply this Planned Parenthood dichotomy to the array of evidence that counsel nicely summarized at the conclusion of his argument. Your Honor, I think that what we have is the district court concluding that each of the out-of-state circulation firms that provided affidavits from their chief executives, the Bader affidavit, the Paparella affidavit, Davis and Cordes, I think I've got those names right, but that each of those is speculative, that none of those is based on, none of those circulation firms has ever, claims ever to have done any work in Oregon before, and their assertion that somehow Measure 26 is going to change whether they would come to, or the implication that it might change whether they would come to Oregon in the future, creates a speculative issue that essentially the court, I would say, disbelieved, found those affidavits unreliable, and I think properly so. The court, and it's important to note also there, when the court says that plaintiffs failed to present the testimony of a single circulator who wouldn't petition in Oregon because of Measure 26, that's absolutely correct. Plaintiffs just listed a litany of affiants and declarants, but none of them, except for Ms. Cordes, claims to be a petition circulator. There are all these firms that hire people to gather signatures, but none of them is a petition circulator, and they claim to know through second-hand or third-hand of somebody, but then it turns out that even that person that they're reporting hearsay from has other reasons why they aren't interested in circulating petitions in Oregon. So the court has that in addition as a very solid reason for finding the evidence unpersuasive. With respect to the one declarant, Ms. Cordes, who claims not just to have a firm but also to circulate some petitions on her own, she's not an Oregon circulator. She's in California. She doesn't claim ever to have been in Oregon, and she doesn't say that she would come to Oregon if it wasn't for Measure 26. She just says that she's not going to with Measure 26 in place. So that hardly shows that plaintiffs have any reduction in the number of voices available to carry plaintiffs' message in support of their Oregon petitions. They haven't shown a single person who would be here but for Measure 26 and who's not because of it. So in those circumstances, I think that the district court was quite correct in not accepting plaintiffs' evidence on the issue and in finding that the believed evidence did not amount to a severe burden if it amounted to any burden at all. I think that the court's language was, little if any, or something to that effect. Plaintiffs fundamentally are laboring under the misapprehension that the district court was obliged to accept their evidence no matter how incredible, and that's not the law. And we would submit that this court would find, even on de novo review, similarly to the district court, that the self-serving speculative testimony of plaintiffs' affidavits and declarants is not persuasive. You have about a minute before you need to yield your time. Thank you for the warning. Your Honor, and on the other side of the ledger, is the State's important and compelling interest that this measure serves. The measure is designed to eradicate a pervasive problem with fraud in the initiative process. Oregon's concerns aren't just with criminal prosecution of fraud that's already occurred. Oregon's got a compelling interest in preventing the fraud in the first place, and Measure 26 is about that. Measure 26 tries to, has identified the bounty that's available for signatures as an inducement to fraud, and the cure that it provides is narrowly tailored, surgically tailored. It's to eliminate the bounty to eradicate the fraud. Oregon's got, we've also discussed in our papers, the compelling interest in. What about these? Comparative statistical analysis or math analysis that counsel drew? Your Honor, I wish I could respond. I didn't follow it. There's been no change in complaints. No, I don't think that that's right. No complaints before or after. I don't, that's certainly outside the record. I was hearing it for the first time. I don't know what he was referring to. I do know that their own applicants, Mr. Arno and Mr. Taylor, claim to have submitted typically hundreds of reports of fraud to the Secretary of State's office in California and other states when they do their petitions in other states, and that they didn't submit as many complaints to the Oregon Secretary of State's office when they were operating under Measure 26. And the ones that they did submit, for some reason, while they submitted their concerns about fraudulent signatures to the other Secretary of State, they lumped those together with duplicate signatures in Oregon. I don't know why. I would just say, jumping to conclusion, that because Measure 26 primarily regulates a business relationship, because it doesn't directly regulate or restrict speech, because the evidence establishes little, if any, indirect burden on speech, and because Measure 26 is concerned with nothing less than protecting Oregon's democracy, the district court's careful decision below should be affirmed. Thank you. Thank you, Your Honors. Margaret Olney for Intervenor, Tim Nesbitt in Oregon AFL-CIO. I'd like to address a couple of the questions that the court posed to the other counsel. First, on this issue of content-based speech, is this a regulation that's content-based? The court was absolutely correct in identifying the nominating and recall process as an entirely different election process. They may have used one mechanism that is similar to the initiative and referendum, but otherwise they are distinct. They have a different number of signatures required. They're in a different part of the statute. They have different recalls in the Constitution. Nominating is in the statute. There's a different timeline for presenting them. There is not the ballot title review process. So in terms of asking whether or not somebody wants to sign this, there's a whole panoply of regulations for the initiative and referendum that do not exist for these other, for nominating and recall. And so I think that they are distinct. It's also entirely permissible for the state to incrementally make changes, and in fact in Oregon it is constitutionally mandated because of Article 17, Section 1 of the Oregon Constitution, prohibits putting initiatives on the ballot that contain multiple amendments to the Oregon Constitution. So that, I think the point is basically it's a different election process. It's not content-based. The referendum side, just because I'm used to California, that's the legislative referral to the voters after the legislature has... Correct. And then by statute and also in the Constitution, that's available at the state level but also at the local levels. And numbers are all based on... I understand. I just want to make sure. Sure. Ms. Olney, I can understand the historical abhorrence of piecework by the labor movement, but isn't the prohibition of getting paid per signature, at least intuitively, a burden on the amount of signatures you can get? Don't you think if you get paid by signatures, you'll get more signatures than if you get paid by the hour? No, if you were paid, not necessarily, because really there are so many factors that go into the ability to collect signatures, and that is set forth in the affidavits of both Ted Blasek and Jeannie Berg, the intervener presented. It includes access, amount of supervision, the amount of pay. If you're getting paid $25 per hour to collect signatures and there has to be a productivity goals related to that, and by regulation those are expressly allowed, that could be a great incentive to keep your job and to gather the signatures. So I don't think it is necessarily antithetical to collecting a lot of signatures to ban the practice of paying per signature. You just have to pay enough to do it. But in any case, you say that the affidavits weigh in favor of your position, and do you have a position on whether we should apply the de novo or clear error rule on that issue? I think they are. That's the factual base record weighing the credibility, weighing the persuasiveness of the different affidavits here. This was not a live trial. Everything was submitted by affidavit and depositions. I think that the trial court judge is entitled to deference on those facts, ultimately leading to the question of whether or not this is a severe burden that is a constitutional fact. But, frankly, I don't think it makes a whole lot of difference. The evidence, I think, in the record is persuasive. Our evidence is much more persuasive than the self-serving affidavits of the plaintiffs. We had the testimony of people who have been, in fact, running signature-gathering campaigns, not just for Measure 26, but historically by paying by hour, and can show that the validity rate is at least as great, if not better. The costs are not out of line, that there is an inherent accountability, because if you're sending people out on the street to gather signatures and you're paying by the hour, you're going to want to make sure they're working. And so there is inherently an effort to supervise and to provide some level of accountability. The problem with the mercenary pay-per-signature system is that there are tiers upon tiers of people involved, all of whom get one level removed from being accountable. The chief petitioner hires a contractor, a contractor hires independent contractors, independent contractors hire yet other people to do this, and at each stage there is an incentive to inflate the numbers. Because you're about out of time, you should address your intervener status. I believe that the court correctly identified the arguments that we would say support intervention here. The timing, we came in at the very beginning. I think the record is clear that we were able to provide the court with essential information that allowed it to understand the process. We have an interest that is also independent as the AFL-CIO, because we are folks who are often the target of initiatives. In fact, there's evidence in Mr. Nesbitt's affidavit that we had sought to have signatures excluded from being counted because we had evidence that they were fraudulently gathered. We had affidavits from people who said, that's not my signature. And the Secretary of State said, they have to count, they have to be counted. And so for us, changing the process and trying to instill more accountability was essential. I also just want to briefly address the issue of this sort of empirical proof of how much evidence do we need to show or what proof do we have to make to show that this is narrowly tailored. And in McConnell, the court, quoting from Shrink, stated that the quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised. And I submit to the court that if you're going to be paid by the signature, there is certainly an incentive to get more signatures, either by fraudulently asking for them or by forging them. And that's the last point. I know that I'm out of time. But to be clear that the ill, the appearance of the problems here are not just straight-out forgery. But it's also misleading the voters. It's the entire practice that was developed under this mercenary signature-gathering practice. And here, the plaintiff's own witnesses said, you know, people are supposed to read these initiatives. It doesn't really matter what we tell them. But in Oregon, that is something that does matter. It is illegal. All right. Thank you very much. I have a lot to respond to. Apparently, my affidavits are self-serving, but their affidavits aren't. I understand. But with regard to the issue of the review, again, the Ninth Circuit precedent on this particular issue, when we're talking about government regulation, I don't believe Planned Parenthood was a government regulation. The issue in Planned Parenthood was whether or not certain printed speech constituted threats or contained malice. And the defendants brought up the issue of First Amendment. Taken in that context, this Court has said repeatedly, and there's a case I believe is cited, Daily Herald v. Monroe, where the Court said, when free speech is implicated, we always review the facts de novo. It could not be any more clear. The Court has said a couple of times about this idea between burden and severe burden. And I'd like to just make it clear that under Meyer and under Buckley, when it comes to regulations on core political speech, the question is whether or not it burdens, but whether or not the regulation burdens the one-on-one communication. And, in fact, if you look at the letter that counsel provided you dated September 9th, he says, then explains that a restriction severely burdens speech, necessitating strict scrutiny, if it will have the inevitable effect of restricting the total quantum of speech on a public issue. And we've demonstrated that this is an effect of limiting the total quantum of speech on a public issue. So the question then becomes, is this a ballot access issue, or is this a free speech regulation? And the point I'd make to the Court is this, if you violate Measure 26, you still get on the ballot. If it was a ballot access regulation, it would seem to me that you wouldn't be able to get on the ballot. The counsel has provided this Caruso opinion regarding ORS 280.070, which requires a certain disclaimer on ballot titles, for lack of a better term. Well, if you don't put that disclaimer on there, you don't get on the ballot. The issue in Caruso was a ballot access regulation. We're talking about regulations that regulate one-on-one communication. Now, with regard to fraud, I understand. The last point I want to make on the issue of fraud is the very campaign that put Measure 26 on the ballot, that paid by the hour, had a complaint of fraud and forgery on it. All right. Counsel, thank you for your arguments in this very interesting case, and we'll be seeing you.
judges: Fisher, Gould, Bea